# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
MICHELLE BARNETT,              *
                               *
        Petitioner,        *       No. 19-1578V
                               *       Special Master Christian J. Moran
v.                             *
                               *       Filed: December 10, 2021
SECRETARY OF HEALTH            *
AND HUMAN SERVICES,            *       Onset numbness
                               *
        Respondent.        *
* * * * * * * * * * * * * * * * * * * *

Brian L. Cinelli, Marcus & Cinelli, LLP, for petitioner;
Lauren Kells, United States Dep't of Justice, Washington, DC, for respondent.

**PUBLISHED FACT FINDING REGARDING ONSET[1]**

      Ms. Barnett alleges a flu vaccine given to her on October 14, 2016 caused her to suffer transverse myelitis. Pet., filed Oct. 10, 2019. The parties dispute when Ms. Barnett began having headaches, when she stopped having headaches, and when she started having numbness. Preponderant evidence supports a finding that Ms. Barnett's headaches started on October 22, 2016, her headaches stopped on January 1, 2017, and her numbness began on March 1, 2017.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Anyone will be able to access this ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website

Procedural History

Represented by Brian Cinelli, Ms. Barnett initiated her case on October 10, 2019. With her petition, Ms. Barnett submitted some medical records. The Secretary disputed Ms. Barnett's entitlement to compensation. Resp't's Rep., filed Sept. 22, 2020. Ms. Barnett submitted additional material. Exhibits 23-32.

Once the documentary record appeared complete, the parties were directed to answer specific questions regarding onset. Order, issued May 3, 2021. Ms. Barnett responded via a document her attorney signed. Exhibit 33. The Secretary answered questions in a status report on June 23, 2021.

A hearing was held on September 24, 2021. Witnesses included Ms. Barnett, Ms. Barnett's husband, Ms. Barnett's brother, and Ms. Barnett's mother. Another witness was a doctor who treated Ms. Barnett after the flu vaccination (Johan Hernandez). With the submission of this oral testimony, the issue is ripe for adjudication.

Standards for Adjudication

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa-13(a)(1). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records may not always list all problems a person is experiencing. See Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021).

Pursuant to these standards for determining when events did or did not happen, the undersigned finds how the evidence preponderates. In setting forth the findings, the undersigned also cites to the primary evidence that is the basis for the finding. The undersigned recognizes that not all evidence is entirely consistent with these findings. See Doe 11 v. Sec'y of Health & Hum. Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010) (ruling that the special master's fact-finding was not

2

arbitrary despite some contrary evidence). Indeed, it is the presence of inconsistent evidence that dictated a proceeding to resolve factual disputes.

Summary of Evidence Relevant to Onset

Ms. Barnett was born in 1970. Exhibit 1 (affidavit) ¶ 2. She worked in several different states as her husband, who was a member of the military, moved. See exhibit 32 at 17-23 (employment application).

By 2010, Ms. Barnett and her husband had moved to South Carolina. Tr. 81. Ms. Barnett established a relationship with a primary care doctor (Chad Millwood) and a gynecologist (Audrey Miller). See exhibit 6 at 1 and exhibit 9 at 1.

Before the allegedly causal vaccination, Ms. Barnett's health appeared to be relatively good. The gynecologist's records do not suggest that Ms. Barnett was having any significant neurologic problems. See exhibit 9, passim. Dr. Millwood's records include that Ms. Barnett was experiencing anxiety and edema. Exhibit 6 at 18. However, in her oral testimony, Ms. Barnett stated that she was not experiencing anxiety or edema. Tr. 85. Dr. Millwood listed edema to justify an off-label use of a medication to treat acne. Id.

Medical records created after vaccination indicate that Ms. Barnett had a history of migraines. E.g., exhibit 4 at 1. However, none of the medical records created before the vaccination show that Ms. Barnett complained to a doctor about migraines. For example, Dr. Millwood's records, which began on January 7, 2014, do not indicate that he treated her for migraines or headaches. Likewise, Dr. Millwood's records do not indicate that Ms. Barnett sought treatment from a neurologist. Nevertheless, the parties appear to accept the accuracy of Ms. Barnett's accounts that she had migraines as reflected in medical records.

Before the vaccination, Ms. Barnett and her husband fostered dogs from a rescue shelter. Exhibit 1 (affidavit) ¶ 19. She obtained these dogs and cared for them until they were adopted permanently. Tr. 11-13. Once an adoption occurred, Ms. Barnett was given another dog. She sometimes cared for as many as 40 rescue animals in one year. Tr. 165. She, additionally, tended to the animals Mr. Barnett and she owned. Tr. 76-77. Other activities included exercising, gardening, and cooking. Tr. 14.

In April 2016, Ms. Barnett began working as a surgery scheduler at Palmetto Health. Exhibit 32 at 2. Palmetto Health employs hundreds, maybe thousands, of people in South Carolina. Tr. 92. Palmetto Health required its employees to

3

receive the flu vaccine.  Tr. 17.   Thus, Ms. Barnett was vaccinated on October 14, 2016 at Palmetto Health.  Exhibit 3; exhibit 7 at 9.

Following this vaccination, Ms. Barnett began to experience severe headaches, but the evidence about when the headaches began is inconsistent.  A November 26, 2016 medical record from an emergency room indicates that Ms. Barnett has a "past history of migraines [and] presents today with a migrainous ongoing now one week."  Exhibit 4 at 1.  However, Ms. Barnett and other witnesses asserted that the headaches began shortly after the October 14, 2016 vaccination.

After receiving some treatment in the emergency room, Ms. Barnett followed up with Dr. Millwood on December 1, 2016.  Exhibit 6 at 23.  While Dr. Millwood's record reflects Ms. Barnett's current experience of a migraine, his record does not provide any information regarding when her pain began.  Dr. Millwood ordered a CT scan, which was more-or-less normal.  Exhibit 4 at 4 (Dec. 9, 2016).

Ms. Barnett's celebration of Christmas in 2016 differed from her celebrations of that holiday in previous years.  In the past, Ms. Barnett decorated her yard extensively, competing with a neighbor to see who displayed the most lights.  Tr. 27-28.  In 2016, that rivalry halted.  Tr. 29.  Ms. Barnett did not feel well enough to decorate.  Id.  She also did not cook her family dinner on Christmas.  Tr. 31.  Instead, the family instituted a new tradition of eating in a Chinese restaurant.  Tr. 31-32, 49, 148, 263.

Ms. Barnett did not seek any medical attention in the later part of December 2016, January 2017, or February 2017.  She testified that although she was experiencing numbness in her arms, she so greatly feared learning that she suffered from multiple sclerosis that she did not consult a doctor.  Tr. 39-41.  During this time, Ms. Barnett stopped fostering rescue dogs.  Tr. 59.

Through Palmetto Health, Ms. Barnett sought medical attention for twisting her knee at work.  The date of this appointment was March 10, 2017.  Ms. Barnett informed the nurse practitioner, Stephanie Hollingsworth, that she hurt her knee approximately one month earlier.  Exhibit 7 at 10.  In the intake form, Ms. Barnett wrote that she was having numbness in her fingertips.  Id.  This is the first mention of numbness in a medical record.

In a follow-up appointment one week later, Ms. Barnett also noted that she was having numbness in her fingertips.  Id. at 28.  The records from Ms.

Hollingsworth indicated that the nurse practitioner treated Ms. Barnett's injured knee, but those records do not reflect any treatment for the numbness in her fingertips. See exhibit 7; see also Tr. 109.

Ms. Barnett saw her gynecologist, Dr. Miller, on March 20, 2017. Dr. Miller recorded that Ms. Barnett was "seen recently for migraines. found they were stress-related. took care of the stress and pt is feeling better now!!" Exhibit 9 at 16. In her oral testimony, Ms. Barnett contested the accuracy of this record, stating that she "never told [Dr. Miller] that" and that she has "never been diagnosed with stress-related migraine." Tr. 110.

Ms. Barnett stopped working for Palmetto Health on April 4, 2017. Exhibit 32 (employment records) at 8. The employment records do not contain any letter of resignation or other explanation of why Ms. Barnett ceased working. In her oral testimony, Ms. Barnett explained that typing exacerbated the pain (or discomfort) she was feeling in her fingertips. Tr. 38, 60. Ms. Barnett acknowledged that she did not seek any medical attention from a doctor about the injury that caused her to stop working until after she quit. Tr. 38-39. Ms. Barnett also did not inform her supervisor about a health condition interfering with her employment and did not request any formal accommodation. Tr. 111. One reason was that Ms. Barnett did not see any way that she could perform the duties of her job without typing. Tr. 38-39, 126.

Sometime in April 2017, Ms. Barnett began to feel a shocking sensation in her neck. Doctors refer to this symptom as Lhermitte's sign. Exhibit 1 (affidavit) ¶ 10.[2]

The feeling of an electrical current running down her spine was one of Ms. Barnett's chief complaints when she saw Johan Hernandez. For this appointment, Ms. Barnett's chief complaint states that she is feeling "electrical current running from neck down to feet when bends forward, numbness in hands x3 mo." Exhibit 8 at 2.[3] In another portion of this record (the history of present illness portion), Dr. Hernandez stated that Ms. Barnett has neck pain and the "neck pain has lasted for 2

---

[2] Lhermitte sign is "the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord." Dorland's Illustrated Med. Dictionary 1684 (33d ed. 2020)

[3] Whether the duration "x3 mo" refers only to the numbness in Ms. Barnett's hand or also refers to the feeling of an electrical current in Ms. Barnett's neck is not clear.

month(s)." Id. Ms. Barnett controverted this duration. She maintained that she told Dr. Hernandez's assistant that she was experiencing numbness for a "few months." Tr. 43-44. However, Dr. Hernandez testified that when a patient communicates an onset a "few months" ago, Dr. Hernandez asks that the patient provide a specific number because the term "few" is vague and could mean different amounts of time to different people. Tr. 211.

Dr. Hernandez ordered an MRI of Ms. Barnett's cervical spine. The result showed a lesion at C2. Possible diagnosis included transverse myelitis and multiple sclerosis. Exhibit 4 at 8.

Following the visit with Dr. Hernandez and the July 17, 2017 MRI, the remaining medical records contain less valuable information about when Ms. Barnett began to experience problems after vaccination. Thus, those records are summarized briefly.[4]

Ms. Barnett first saw a neurologist, Miroslav Cuturic, on October 6, 2017. This history states Ms. Barnett presents "for evaluation of paresthesias that have started following a flu vaccination in November 2016." Exhibit 10 at 1. To the extent that this record indicates that the paresthesias started in November 2016, Ms. Barnett challenged this record's accuracy. Tr. 69-70. Dr. Cuturic also recorded Ms. Barnett quit her job. Dr. Cuturic recommended another MRI. This MRI again showed a focus at C2. Exhibit 4 at 10.

Dr. Cuturic informed officials at the Centers for Disease Control that Ms. Barnett developed several problems after receiving a flu vaccine by submitting a Vaccine Adverse Event Reporting Services form. Exhibit 12. These problems included "demyelinated lesion on the spinal cord," "Lhermittes sign," "paresthesias," among others. Ms. Barnett stated that Dr. Cuturic submitted the VAERS report because he believed it was a possibility that the flu vaccine caused her symptoms. Tr. 118.

After a third MRI and some intervening appointments, Ms. Barnett saw Dr. Cuturic again on June 8, 2018. Dr. Cuturic stated that Ms. Barnett was following up on "a spinal cord lesion following a vaccination, more than a year ago." Exhibit 10 at 18. He diagnosed her with "clinically isolated syndrome" and recommended

---

[4] For example, Ms. Barnett experienced problems with urinating. While a problem with urinating may (or may not) be caused by a lesion in her spinal cord, the records about this problem do not discuss when Ms. Barnett first experienced problems with numbness.

a second opinion from a clinic that treats people with multiple sclerosis. Dr. Cuturic also advised against future vaccinations. Exhibit 10 at 18; exhibit 14.

The second opinion came from a doctor in Palmetto Health System, Renu Pokharna on September 11, 2018. Dr. Pokharna obtained a history in which Ms. Barnett developed numbness three days after the flu shot and the electrical sensation has continued since about three days after vaccination. Exhibit 10 at 19-21. Dr. Pokharna diagnosed Ms. Barnett with "postvaccinal cervical transverse myelitis" and recommended against future vaccinations. Id.; see also exhibit 15 (letter, dated July 12, 2019).

After Ms. Barnett initiated this litigation, her husband's employer transferred him to a different location. After moving in 2021, Ms. Barnett saw a new neurologist, Sandip Jain. Dr. Jain's history indicated that "Patient developed myelitis at C2 level in her cervical spine around 2016 several weeks after receiving the flu vaccine." Exhibit 35 at 16 (Mar. 9, 2021). This is the most recent relevant medical record.

## Analysis

The parties identified three issues on which a finding would be helpful. They are (1) when did Ms. Barnett begin experiencing headaches, (2) when did Ms. Barnett stop experiencing headaches, and (3) when did she start experiencing numbness in her hands.

### *Headaches: Start and Stop*

The evidence regarding when Ms. Barnett began to experience headaches is not particularly robust. The medical record created when Ms. Barnett was having headaches, the November 26, 2016 emergency room record, states that her headaches have been worse for about a week. Exhibit 4 at 1. The term "worse" implies that Ms. Barnett had headaches for more than seven days, but the record does not specify when the headaches originated.

The testimony—whether submitted via an affidavit or presented orally during the hearing—points to an onset in late October. See exhibit 24 (Stephen Kutz's affidavit) ¶ 4, exhibit 25 (Jacqueline Kutz's affidavit) ¶ 4; Tr. 141-43, 231-32. No medical record directly contradicts this testimony.

At most, it might be argued that Ms. Barnett's failure to seek medical attention on, say, November 1, 2016 implies that Ms. Barnett was not having headaches. This logic is not persuasive in this situation. The parties have accepted

7

that Ms. Barnett had headaches or migraines for years, despite the lack of treatment for headaches. In addition, Ms. Barnett has demonstrated that she did not seek medical attention swiftly. See exhibit 7 at 10 (report twisting her knee about a month earlier).

Accordingly, a preponderance of the evidence establishes that Ms. Barnett began to have headaches on October 22, 2016. These headaches worsened on November 19, 2016.

The next question is when did the headaches end? Again, the evidence is not robust. No medical record affirmatively states that Ms. Barnett's headache stopped on a particular date. Because Ms. Barnett did not report a headache to the nurse practitioner, Ms. Hollingsworth, on March 10, 2017, exhibit 7 at 10, it appears that Ms. Barnett was not experiencing a headache on that date. This finding is reinforced by the history Ms. Barnett provided to her gynecologist on March 20, 2017. Then, she told Dr. Miller her migraines were improved. Exhibit 9 at 16.

Witnesses testified that Ms. Barnett's headaches began to subside around early or mid December 2016, which was around the time, according to the testimony, that Ms. Barnett started to experience numbness in her hands. Tr. 146, 234-35. The witnesses associated the lack of Christmas decorations in 2016 with Ms. Barnett's decline in health.

The testimony regarding the lack of Christmas decorations in 2016 was persuasive. The witnesses appeared to be forthright, and their testimony was relatively consistent. The Secretary did not impeach this testimony and did not present any contrary evidence, such as testimony from a neighbor who saw the Barnett's house was decked out in 2016.

While a preponderance of the evidence supports a finding that Ms. Barnett did not decorate her house for Christmas in 2016, the reason for the lack of decoration is slightly different. A preponderance of the evidence supports a finding that the health problem that interfered with Ms. Barnett's holiday festivities was the continuation of her headaches. As explained below, the finding that Ms. Barnett experienced severe headaches throughout December 2016 dovetails with the finding that Ms. Barnett did not experience numbness in her hands and feet in December 2016. In the absence of numbness, the remaining explanation for Ms. Barnetts' ill-health, which dampened her holidays, is her headaches. Thus, the undersigned finds that Ms. Barnett's severe headaches lasted until approximately January 1, 2017.

*Numbness*

The remaining, and perhaps most critical, question is when Ms. Barnett began to experience numbness in her hands. She maintains that she started to experience numbness in mid-December 2016. The Secretary, in contrast, points to Dr. Hernandez's May 24, 2017 record in which he recorded that Ms. Barnett was having numbness in her hands for three months and neck pain for two months. Exhibit 8 at 2.

Dr. Hernandez's oral testimony helped resolve the dispute because his testimony was powerful. Dr. Hernandez seemed careful in discussing only matters about which he was informed. Tr. 181, 183. His apparent conscientiousness in testifying matched the way that he recorded histories. According to Dr. Hernandez, he asks patients to define how long they have experienced symptoms using numeric quantities, rather than vague concepts such as a "few months." Tr. 211. So, Ms. Barnett's testimony that she told Dr. Hernandez's medical assistant that she was having problems for a "few months," Tr. 43-44, may be accurate. If Ms. Barnett did use this vague phrase, Dr. Hernandez clarified it during his consultation with her on May 24, 20217. Dr. Hernandez's oral testimony about how he creates medical records strengthened the value of the medical record that he created on May 24, 2017.

The May 24, 2017 medical record, as already noted, indicates that Ms. Hernandez had numbness in her hands for three months and neck pain for two months. Exhibit 8 at 2. This chronology implies that the hand numbness began in February 2017 and the neck pain began in March 2017. A reasonable inference is that Ms. Hernandez's numbness began on March 1, 2017 because she reported numbness in her fingertips on March 10, 2017. Exhibit 7 at 10.

In crediting Dr. Hernandez's May 24, 2017 medical record, the undersigned is necessarily giving less weight to other evidence. See Whitecotton v. Sec'y of Health & Hum. Servs., 81 F.3d 1099, 1108 (Fed. Cir. 1996) (special masters enjoy discretion in the weighing of evidence). For example, the testimonial assertions that Ms. Barnett was experiencing numbness carries less weight here because the testimony was presented years later. See Mueller v. Sec'y of Health & Hum. Servs., No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) (stating "the logical fact" that "memories fade with the passage of time"); Velchek v. Sec'y of Health & Hum. Servs., No. 02-1479V, 2005 WL 2847451, at *17 (Fed. Cl. Spec. Mstr. Oct. 28, 2005) (recognizing "the passage of time dulls memories" and accordingly assigning greater weight to contemporaneous records). Similarly, the history that Dr. Cuturic obtained on October 6, 2017 is less reliable

because it was not a history about contemporaneous events. Dr. Cuturic stated one complaint was "paresthesias that have started following flu vaccine in Nov. 2016." Exhibit 10 at 1. In his January 4, 2018 VAERS report, Dr. Cuturic specified that she began to have paresthesias within a week of the October 14, 2016 flu vaccine. Exhibit 12. But, these histories suggesting an onset of numbness in less than a week are not accurate as Ms. Barnett recognized in her testimony. Tr. 69.[5]

March 1, 2017 is 138 days (approximately four and one-half months) after the October 14, 2016 vaccination. Whether 138 days is an interval consistent with the vaccine as a cause remains an open and unexplored question in this case. Similarly, whether the headaches Ms. Barnett experienced from October 22, 2016 through December 31, 2016 are connected to the numbness starting on March 1, 2017 is also not determined here.

## Conclusion

For the reasons explained above, the evidence preponderates in favor of the following findings:

1. Ms. Barnett started to experience headaches on October 22, 2016.

2. Ms. Barnett's headaches began to worsen on November 19, 2016.

3. Ms. Barnett's headaches stopped on January 1, 2017.

4. Ms. Barnett's numbness started on March 1, 2017.

The parties are ordered to provide this ruling to any expert she or he retains.

A status conference is scheduled, sua sponte, for **Wednesday, January 5, 2022, at 10:00 A.M. (Eastern Time)**. The parties should be prepared to discuss potential next steps.

**IT IS SO ORDERED**.

---

[5] When a doctor's opinion that a vaccine harmed someone relies upon an inaccurate knowledge of the person's history, a special master is not required to credit the doctor's causation opinion. Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 3 F.3d 415, 417 (Fed. Cir. 1993).

<u>s/Christian J. Moran</u>  
Christian J. Moran  
Special Master